IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
EASTERN DIVISION

CYNTHIA M. YOST,                              :          Case No. 4:13-CV-01116

    Plaintiff,                                 :

      vs.                                    :

                                               :

COMMISSIONER OF SOCIAL SECURITY                           MAGISTRATE'S REPORT AND
                                               :          RECOMMENDATION.

    Defendant.

## I. INTRODUCTION.

Plaintiff seeks judicial review of Defendant's final decision denying her claim for Disability Insurance Benefits (DIB) under Title II the Social Security Act (Act).  Her case was automatically referred to the undersigned Magistrate Judge for report and recommendation.  Pending are the Briefs on the Merits filed by the parties and Plaintiff's Reply (Docket Nos. 14, 15 & 18 ).  For the reasons that follow, the undersigned Magistrate recommends that the Court affirm the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On April 3, 2009, Plaintiff filed an application for Supplemental Security Income (SSI) and an application for DIB, alleging that she became unable to work because of her disabling condition on September 12, 2006 (Docket No. 11, pp. 71-74; 121-123 of 913).  The application for SSI was denied on April 10, 2009 because Plaintiff's income exceeded the allowable limit (Docket No. 11, p. 71 of 913).  The application for DIB was denied initially on February 23, 2010 and upon reconsideration on

September 3, 2010 (Docket No. 11, pp. 79-82; 87-89 of 913). On November 15, 2011, Administrative Law Judge (ALJ) Barbara Sheehe conducted a video hearing, at which Plaintiff, represented by counsel, and Vocational Expert (VE) Bruce Holderead, appeared (Docket No. 11, p. 40 of 913). On November 21, 2011, the ALJ issued an unfavorable decision, finding that Plaintiff had not been under a disability as defined in the Act from the date her impairment began through the date of the ALJ's decision (Docket No. 11, pp. 15-32 of 913). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of the ALJ's decision on April 30, 2013 (Docket No. 11, pp. 6-8 of 913). Plaintiff timely filed a Complaint in this Court seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).

### III. PLAINTIFF'S TESTIMONY.

Plaintiff has an associate degree in the Applied Science of Paralegal Studies. In late 2008 and/or early 2009, Plaintiff was employed as a full-time office manager at Goodwill Industries. Her duties included maintaining the filing system and answering the telephone (Docket No. 11, p. 54 of 913). Plaintiff had a valid driver's license and she drove three days per week (Docket No. 11, p. 55 of 913).

Plaintiff testified that her Chronic Obstructive Pulmonary Disease (COPD) which caused dyspnea, right side pain, and numbness in her toes and feet was worsening. The shortness of breath affected her ability to walk or descend stairs. She acknowledged exacerbation of COPD by her nicotine usage but suggested that she smoked to relieve stress (Docket No. 11, pp. 43-47; 48 of 913).

Plaintiff began having heart trouble in 2006. She recalled that the inciting incident was the loss of her peripheral vision. At the time of the hearing, Plaintiff continued to have vision problems and wore bifocals. As for her heart trouble, small mesh tubes had been placed in her arteries. Plaintiff continued to have chest pain aggravated by lifting, carrying, walking, cleaning or vacuuming. With the

2

onset of chest pain, Plaintiff sat down and rested until the pain subsided.  Plaintiff estimated that she used Nitroglycerin once monthly (Docket No. 11, pp. 47-48; 50; 60 of 913).

Plaintiff suffered from shooting pain which radiated up her right leg where the vein was harvested for open heart surgery.  Because her feet and toes would "go numb," she had difficulty walking and maintaining her balance (Docket No. 11, pp. 48-49 of 913).

Plaintiff was diagnosed with insulin-dependent diabetes.  She administered an insulin injection daily and supplemented her regimen with Metformin and Glipizide, medications generally used with insulin to help lower blood sugar (Docket No. 11, p. 49 of 913).

Plaintiff was prescribed medication for depression.  The side effects of the medication included memory lapses, lapses in consciousness and difficulty concentrating more than 45 minutes at a time (Docket No. 11, pp. 52-53 of 913).

Recently, Plaintiff complained of right arm pain and numbness that were particularly disturbing at night.  She attributed these symptoms, in part, to an unsuccessful carpal tunnel surgery.  Plaintiff's ability to hold and manipulate small items or type was limited (Docket No. 11, pp. 51-52; 57-58 of 913).

It was Plaintiff's contention that she could:

- Stand in one spot for 15 minutes.
- Sit for one hour before getting up to visit the restroom.
- Walk roughly 20 minutes.
- Lift 10 pounds.

(Docket No. 11, pp. 56-57 of 913).

During a typical day, Plaintiff dressed herself, used the computer to connect with friends and family, played games and watched television.  When feeling well, Plaintiff did the laundry, cleaned and cooked meals.  Plaintiff exercised, walking daily for roughly 20 minutes followed by sitting down and exercising her toes to regain feeling and equilibrium.  Plaintiff drove to dart practice on Tuesday

3

evenings, dart league on Wednesday evenings and grocery shopping once monthly.  Plaintiff had difficulty sleeping through the night (Docket No. 11, pp. 48-49; 52-53; 55; 57; 58-59 of 913).

## IV. THE VE'S TESTIMONY.

Initially, the VE stated that he would make clear if inconsistencies in his testimony or otherwise departed from information in the DICTIONARY OF OCCUPATIONAL TITLES (DOT)[1] and its companion volume, SELECTED CHARACTERISTICS OF OCCUPATIONS[2] (Docket No. 11, pp. 69; 158 of 821).  The VE noted a correction to the record, determining that Plaintiff had a long-term employment experience as a legal secretary, not a paralegal (Docket No. 11, pp. 62-63 of 913).

The ALJ proceeded with the *first* hypothetical:

> Assume an individual of the same age, education and past relevant work experience as Plaintiff; limited to lifting and carrying five pounds frequently and ten pounds occasionally; sitting for six hours during the course of an eight-hour day and standing and/or walking two hours; this individual should never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs, balance and crouch; this individual should avoid concentrated exposure to extremes of heat and cold as well as fumes, odors, dust, gases and poorly ventilated areas; this person is precluded from occupational driving and should avoid exposure to all workplace hazards, such as unprotected heights and dangerous machinery; and this individual is precluded from tasks with high production quotas such as piecework or assembly line work and strict time requirements.  With this residual functional capacity (RFC), could such individual return to any of the claimant's past relevant work?

The VE responded that this hypothetical individual could perform the legal secretary and office manager jobs but not the past work as a bartender (Docket No. 11, pp. 63-64 of 913).

In the *second* hypothetical, the ALJ posited:

---

[1]

This publication provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

[2]

This publication supplements the lists of individual physical demands, working conditions and training time data for each jobs defined in DOT.  Http://eric.ed.gov.

I am going to add the further limitation of low stress tasks and preclude tasks requiring high production quotas and strict time requirements; no arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety of other. With this RFC, could such an individual return to any of Plaintiff's past relevant work?

The VE responded that considering the addition to the hypothetical, the legal secretary and secretary jobs were fairly complex, semi-skilled jobs that would be eliminated by the hypothetical individual's RFC. Regardless, Plaintiff had skills that were transferrable to sedentary, semi-skilled work which a typical worker could develop the facility needed for average performance in up to three months. The jobs that will accommodate an individual with this profile are available as delineated:

| JOB/DOT NUMBER | NORTHEAST OHIO | OHIO | NATIONAL |
|---|---|---|---|
| Data Entry Clerk/209.387-022 | 1,000 | 4,000 | 80,000 |
| Routing Clerk/249.367-070 | 500 | 2,000 | 45,000 |
| Credit Card Control/249.367-026 | 400 | 1,500 | 30,000 |

(Docket No. 11, pp. 64-65 of 913).

In the *third* hypothetical, the ALJ added:

. . . the further limitation that such an individual would be limited to simple, routine tasks which can be learned in 30 days or less.  Would this individual have transferrable skills?

The VE suggested that this hypothetical individual could perform these sedentary jobs which are available as follows:

| JOB/DOT NUMBER | NORTHEAST OHIO | OHIO | NATIONALLY |
|---|---|---|---|
| Charge Account Clerk/205.367-014 | 350 | 1,100 | 35,000 |
| Addresser/209.587-010 | 700 | 2,000 | 25,000 |
| Order Clerk/209.567-014 | 250 | 750 | 20,000 |

(Docket No. 11, p. 66 of 913).

In the *fourth* hypothetical, the ALJ added:

. . . the further limitation that, as a result of symptoms, such as an individual would be off task 20% of the time or more.  Would there be any jobs for such an individual?

5

The VE responded that in his professional opinion, there would be no work for such a hypothetical individual.  The basis for this testimony regarding the limitation is his training, education, experience, knowledge of the labor market and consultation with colleagues as  the DOT does not address the percentage of time off task.

In the *fifth* hypothetical, the ALJ proposed that:

> What if, as a result of symptoms, such individual would miss two or more days of work per month?  Would there be any jobs for such an individual? .

The VE responded that in his professional opinion, there would be no jobs for such individual. Because the DOT also does not address absenteeism, the basis for his testimony would be the same as given for the fourth hypothetical (Docket No. 11, p. 67 of 913).

## V. MEDICAL EVIDENCE.

Medical evidence is the cornerstone of the Social Security Disability determination process. Plaintiff is responsible for providing evidence showing that she has an impairment and that the impairment is of the severity to be disabling as defined under the Act.  A chronological review of medical evidence provided by Plaintiff follows.

**A.    PHYSICAL IMPAIRMENTS–EVALUATIONS AND TREATMENT.**

On July 15, 2006, the results from Plaintiff's blood chemical analysis, urinalysis and comprehensive metabolic panel were completed.  The total cholesterol level exceeded the variations of a measurement or value considered normal in healthy individuals; the level of glycated hemoglobin was in the cautionary zone; the white blood count exceeded the variations of a measurement or value considered normal in healthy people and the urine sample tested positive for nitrates (Docket No. 11, pp. 223-224 of 913).

On September 11, 2006, Plaintiff was admitted to the hospital with complaints of chest pain.

6

Plaintiff's glucose levels were elevated in excess  normal blood sugar levels in a healthy individual. Yet, the results from the electrocardiogram (EKG) were within normal limits and demonstrated a normal sinus rhythm; the chest X-ray showed no evidence of acute process; the computed tomography (CT) of the head was normal; and the cardiolite stress test was inconclusive.  Dr. Sanjay R. Bharti, M. D., an internal medicine specialist, attributed the pain to a burning sensation arising from behind the breastbone and in the upper central region of the abdomen (Docket No. 11, pp. 242-277 of 913; www.healthgrades.com/physician/dr-sanjay-bharti).

On September 21, 2006, the CT scan of Plaintiff's chest showed no evidence of a pulmonary embolism and the portable chest X-ray showed a normal chest (Docket No. 11, pp. 320; 321 of 913). While undergoing a stress echocardiogram (ECG) on September 22, 2006, Plaintiff fainted.  Although the apparatus strapped to her chest registered no abnormality, the results from the cardiac catheterization that was subsequently administered, showed high-grade stenosis involving the distal left anterior descending coronary artery and high grade stenosis involving the second diagonal branch.  Dr. Bharti employed a treatment plan that included aggressive risk factor modifications (Docket No. 11, pp. 279-282; 302-319 of 913).

On October 4, 2006, Dr. Morgan H. Lyons, Jr., M.D., an internal medicine specialist, diagnosed Plaintiff with coronary artery disease (CAD).  Dr. Lyons recommended that tests be performed to determine whether an angioplasty was required to restore blood supply to the heart (Docket No. 11, pp. 323-324 of 913; www.healthgrades.com/physician/dr-morgan-lyons).

Plaintiff's glucose serum level exceeded the variations of a measurement or value considered normal in healthy individuals on October 12, 2006.  Otherwise, the results of the chemistry screen that measured several substances in the blood were within the normal range (Docket No. 11, p. 222 of 913).

Because of increased chest pain, Plaintiff underwent a catheterization and coronary angioplasty

with successful results on both arteries on October 26, 2006 (Docket No. 11, pp. 326-338 of 913).

Plaintiff presented to the emergency room on December 29, 2006 with chest pain and dyspnea. The emergency room physician, Dr. John Maxfield, M.D., reported that a thorough examination was performed and that Plaintiff was found to have no Emergency Medical Treatment and Labor Act[3] emergency medical condition (Docket No. 11, pp. 762-764 of 913).

Plaintiff presented to the emergency room on January 29, 2008, with chest pain and Dr. Richard L. Weitzel, Jr., M. D., diagnosed her with cardiac ischemia and severe 2-vessel coronary disease. Plaintiff underwent successful double bypass surgery on February 1, 2008, and was discharged with medication therapy and home health care to assist with regulating her diabetes (Docket No. 11, pp. 343-351; 366-372 of 913; www.healthgrades.com/physician/dr-richard-weitzel).

On April 18, 2008; September 11, 2008; and February 9, 2009, Dr. Weitzel adjusted Plaintiff's drug regimen, adding medication that assisted with recurrent chest pain and prevented known vessel disease and urged Plaintiff to lose weight and quit smoking (Docket No. 11, pp. 357-365 of 913).

For the Bureau of Disability Determination (BDD), Dr. Jason A. Rupeka, D.O., completed a questionnaire that highlighted his treatment relationship with Plaintiff from July 1, 2008 through May 5, 2009.  Dr. Rupeka made several key findings; notably:

- Plaintiff experienced chest discomfort and dyspnea on exertion, at rest and walking one to two blocks.
- Plaintiff's chest discomfort could be relieved by rest and nitroglycerin.
- There were no medical contraindications to performing exercise stress testing.
- Plaintiff gets fluid overload and has a diastolic dysfunction.
- Plaintiff has neuropathy in both feet (Docket No. 11, pp. 378-381 of 913).

During the course of this relationship, Plaintiff stopped taking her medication for a period of

---

[3]

In 1986, Congress enacted the Emergency Medical Treatment & Labor Act to ensure public access to emergency services regardless of ability to pay.

approximately three weeks.  On March 27, 2009, she presented to the emergency room complaining of chest pain and shortness of breath.  Dr. Rupeka admitted Plaintiff to the hospital and ordered several diagnostic tests which confirmed that Plaintiff's glucose level, white blood count and potassium levels were elevated above the normal range and that she had severe stenotic native coronary atherosclerosis, defect with high grade stenosis in the right CAD and a recent fracture of the right 9th rib.  An anticoagulant was added to her drug regimen (Docket No. 11, pp. 766-798 of 913).

On April 24, 2009 and July 27, 2009, Dr. Weitzel noted that Plaintiff's EKG showed a normal sinus rhythm.  Although there had been no acute changes, Dr. Weitzel was concerned that obesity would impact Plaintiff's long term prognosis and increase her risks of further abnormality (Docket No. 11, pp. 392-393; 395-396 of 913).

Dr. Sara R. Irvin, M. D., a family medicine practitioner, ordered diagnostic imaging and laboratory tests on June 29, 2009 (Docket No. 11, pp. 507-508 of 913).

On July 1, 2009, Plaintiff underwent a biopsy from a specimen of skin over the posterior shoulder, bilaterally. The results were negative for immune mediated vesicular bullous skin lesions on the left and positive for interface dermatosis over the right (Docket No. 11, pp. 385-387 of 913).

Results from an ultrasound of the neck showed an enlarged thyroid on July 2, 2009 (Docket No. 11, p. 589 of 913).

On July 27, 2009, Dr. Weitzel prescribed a medication used to treat hypertension and angina. He conducted the stress test on September 22, 2009 and the results showed no evidence of stress induced ischemia, infarct or scar (Docket No. 11, pp. 580-581; 700-701 of 913).

Plaintiff complained of nausea and Dr. Irvin conducted a gastric emptying study on December 16, 2009.  The results were normal (Docket No. 11, p. 557 of 913).  However, test results from blood work analysis showed an elevated WBC and intestinal infection (Docket No. 11, p. 735 of 913).

Dr. Weitzel conducted a stress/rest gated nuclear cardiac examination on January 21, 2010, and there was no evidence of stress induced ischemia, infarct or scar.  Plaintiff's red blood cell distribution width (RBCDW) was slightly elevated above the normal range (Docket No. 11, p. 552 of 913).

On January 29, 2010, Plaintiff's blood test revealed hemoglobin and hematocrit levels that were lower than the range considered normal in healthy individuals and her RBCDW exceeded the reference range considered normal in healthy individuals (Docket No. 11, p. 486 of 913).         For the BDD, Dr. Hai-Shiuh M. Wang, M.D., a specialist in ophthalmology, conducted an examination on February 12, 2010 and determined that Plaintiff had early secondary membrane and  no diabetic retinopathy (Docket No. 11, pp. 446-449 of 913).

Dr. Paul Morton, M.D., a medical consultant, completed the PHYSICAL RFC ASSESSMENT on February 18, 2010 and determined that Plaintiff could:

- Occasionally lift and/or carry twenty pounds; climb using a ramp/stairs; balance; or couch.
- Frequently lift and/or carry ten pounds.
- Stand and/or walk about six hours in an eight-hour workday.
- Sit about six hours in an eight-hour workday.
- Push and/or pull on an unlimited basis.
- Never climb using a ladder/rope/scaffold.
- Not be exposed to extreme cold, heat, fumes, odors, dusts, gases, poor ventilation or hazards.

(Docket No. 11, pp. 437-444 of 913).

Plaintiff's medication intake monitoring was conducted by Dr. Irwin on March 5, 2010 (Docket No. 11, p. 731 of 913).  On March 12, 2010, Plaintiff presented to the neurodiagnostic clinic with complaints of pain, numbness and tingling in both hands, more pronounced in the right.  Dr. Hyo H. (Paul) Kim, M. D., a pain medicine specialist, determined that Plaintiff had left carpal tunnel syndrome, mild (Docket No. 11, p. 451 of 913; www.healthgrades.com/physician/dr-hyo-kim).

10

Dr. Rony C. Awaida, M.D., a gastroenterology specialist, saw Plaintiff in consultation for evaluation of diarrhea, weight loss, nausea and black tarry stools.  The stool culture taken on March 12, 2010, showed no abnormality; the esophagogastroduodenoscopy performed on March 17, 2010 revealed a small hiatal hernia with a normal esophagus; the colonoscopy performed on March 19, 2010, showed mild scattered colonic erythema and small internal hemorrhoids; and the microscopic examination showed a hyperplastic polyp but no evidence of malignancy.  Dr. Awaida recommended that Plaintiff continue treatment for bacterial infections and that she supplement her diet with fiber (Docket No. 11, pp. 474-475; 480-482 of 913).

Dr. Awaida ordered a CT examination and on April 8, 2010, the results revealed a mild fatty liver, an unremarkable abdomen and a nonspecific heterogeneous sclerotic lesion in the posterior right ischium.  On April 23, 2010, Dr. Awaida ordered further study to rule out irritable bowel syndrome (Docket No. 11, pp. 489-493; 810-811 of 913).

On April 30, 2010, Plaintiff presented to Dr. Irvin with complaints of numbness in her extremities.  Dr. Irvin increased the dosage of Plaintiff's sleep aid and ordered blood tests and a bone scan (Docket No. 11, p. 498 of 913).

On May 3, 2010, Plaintiff had a Vitamin B deficiency; her RBCDW and glucose level exceeded the normal range, and her high density lipoprotein (good cholesterol) was lower than the normal range (Docket No. 11, pp. 477-479 of 913).  Results from the bone scan administered on May 5, 2010, showed no significant evidence of osseous metastatic disease (Docket No. 11, p. 523 of 913).

On June 1, 2010, Dr. Irvin started Plaintiff on a liquid insulin that was injected subcutaneously. Acknowledging that Plaintiff had symptoms of depression with anxiety, on June 10, 2010, Dr. Irvin made a recommendation for counseling (Docket Nol 11, pp. 494-496 of 913; www.nlm.nig.gove/medlineplus/druginfo).

11

For BDD, Dr. Mary-Helene Massullo, D. O., a specialist in general surgery, examined Plaintiff and made these observations on August 2, 2010:

- Plaintiff's tobacco abuse and moderated exogenous obesity constitute noncompliance with treatment.
- Plaintiff had a history of alcohol and drug abuse.
- Plaintiff's blood pressure is under fair control
- Plaintiff had multiple tattoos and ear piercings.
- Plaintiff had several benign growths and small benign tumors.
- Plaintiff could perform in a seated position.
- Plaintiff could lift her shoulders, elbows, wrists, fingers, hips, knees, feet and great toe against maximal resistance.
- Plaintiff's range of motion in the cervical spine, shoulders, dorsolumbar spine, elbows, wrists, hands-fingers, hips, knees and ankles was within normal limits

(Docket No. 11, pp. 612-616; 617-620 of 913; www.healthgrades/physician/dr+mary-helene+massullo).

Dr. Eli N. Perencevich, D. O, an internal medicine specialist, conducted a PHYSICAL RFC ASSESSMENT on August 25, 2010, and determined that Plaintiff could:

- Occasionally lift and/or carry twenty pounds; climb using a ramp/stairs; balance; or couch.
- Frequently lift and/or carry ten pounds.
- Stand and/or walk about six hours in an eight-hour workday.
- Sit about six hours in an eight-hour workday.
- Push and/or pull on an unlimited basis.
- Never climb using a ladder/rope/scaffold.
- Not be exposed to extreme cold, heat, fumes, odors, dusts, gases, poor ventilation or hazards.

(Docket No. 11, pp. 622-628 of 913; www.healthgrades.com/physician/dr-eli-perencevich).

On August 26, 2010, Plaintiff began the use of a medication designed for short-term treatment of insomnia (Docket No. 11, p. 859 of 913).

Dr. Weitzel noted that Plaintiff had recurrent angina with history of severe CAD.  The EKG showed normal sinus rhythm and there was no clinical evidence of deep vein thrombosis (DVT) (Docket No. 11, pp. 834-835 of 913).

12

The sonography of the carotid artery taken on September 22, 2010, showed no stenosis exceeding 50% involving the internal carotid arteries (Docket No. 11, p. 823 of 913). The chest X-ray taken on September 28, 2010 showed lungs that were clear and no acute intrathoracic abnormality (Docket No. 11, pp. 822; 839 of 913).

On October 5, 2010, Dr. George J. Aromatorio, M. D., inserted an arterial hemostatic valve sheath in the right femoral artery. The results showed normal left wall motion; no significant lesions on the left main artery; the left anterior descending (mid), tubular 100% in-stent occlusion on the left anterior and discrete 25% lesion on the right coronary artery (Docket No. 11, pp. 799-801 of 913).

Dr. Weitzel examined Plaintiff on April 8, 2011, and determined that:

• Plaintiff had gained weight.
• Plaintiff continued to smoke.
• There was no clinical evidence of DVT.

(Docket No. 11, pp. 832-833 of 913).

Plaintiff presented to urgent care with index finger pain and swelling on May 16, 2011. Diagnosed with gout, unspecified and questionable, the attending physician noted that the three images of Plaintiff's hands showed no evidence of an acute fracture or definite bone lesion (Docket No. 11, pp. 829; 908-913 of 913).

On May 19, 2011, Plaintiff was treated at the emergency room for pain in her left hand. Diagnosed with gout, unspecified, Plaintiff was educated on how to control the uric acid in her body (Docket No. 11, pp. 854-855 of 913).

On June 2, 2011, Plaintiff underwent a stress test and the results showed no evidence of stress induced ischemia, infarct or scar (Docket No. 11, p. 837 of 913).

Plaintiff complained of neck stiffness on August 15, 2011, for which she was prescribed Ibuprofen, given exercises for neck strain and advised to adhere to a low salt diet, avoid smoking and

avoid exposure to secondhand smoke (Docket No. 11, pp. 849-853 of 913).

On October 6, 2011, Plaintiff was treated at urgent care for bronchitis, obstructive and chronic with acute exacerbation.  She was placed on Prednisone and Albuterol (Docket No. 11, pp. 903-907 of 913).

### B.    MENTAL/PSYCHIATRIC REVIEWS AND EXAMINATIONS.

Dr. Andrea M. VanEstenberg, Ph. D., conducted a 45-minute clinical interview on December 28, 2009, and used the Global Assessment of Functioning, a subjective rating of how well an individual meets the various problems in social, occupational and psychological functioning, to determine that Plaintiff had moderate symptoms or moderate difficulty in these areas.

Dr. VanEstenberg rated Plaintiff's work-related mental abilities accordingly:

- Plaintiff's ability to relate to others was moderately impaired.
- Plaintiff's mental ability to understand, remember and follow instructions was not impaired at that time.
- Plaintiff's mental ability to maintain attention, concentration, persistence and pace to perform routine tasks was not impaired at the time.
- Plaintiff's ability to withstand the stress and pressures associated with the day-to-day expectations and activities is mildly impaired.
- Plaintiff had the mental stress tolerance to perform at least simple repetitive tasks but not to interact with the public.

(Docket No. 11, pp. 400-407 of 913; www.ncbi.nlm.nih.gov).

Dr. Aracelis Rivera, Psy. D., a clinical psychologist, completed the PSYCHIATRIC REVIEW TECHNIQUE form for the period of September 12, 2006 to January 25, 2010.  She concluded that:

- Plaintiff had two medically determinable impairments, namely, a depressive disorder and a generalized anxiety disorder ("A" Criteria of the Listings).
- Plaintiff had a mild degree of functional imitation in the restriction of activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence or pace ("B" Criteria of the Listings).
- There were no episodes of decompensation ("B" Criteria of the Listings).

14

- There was no evidence to establish the presence of the "C" criteria[4].
- Plaintiff's impairment was not severe.

(Docket No. 11, pp. 409-422 of 913).

On June 28, 2010, Plaintiff presented to PSYCARE, a comprehensive behavioral healthcare provider, for an intake assessment. Dr. Jessica L. Hart, Ph. D., conducted a historical review of Plaintiff's background, medical history and mental status. Using the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM), a publication of the American Psychiatric Association that offers a standard way of classifying mental disorders, Dr. Hart compartmentalized Plaintiff's mental impairments accordingly:

| AXIS | WHAT IT IS | WHAT IT MEASURES | DR. HART'S APPLICATION TO PLAINTIFF |
|------|------------|------------------|-------------------------------------|
| I | Clinical disorders. | This is what the clinician actually thinks of as the diagnosis | Major depression, recurrent; bereavement and partner relational problem. |
| II | Developmental disorders & personality disorders. | Developmental disorders include autism and mental retardation, disorders which are typically first evident in childhood and Personality disorders are clinical syndromes which have more long lasting symptoms and encompass the individual's way of interacting with the world. | No diagnosis. |
| III | Physical conditions. | Which play a role in the development, continuance, or exacerbation of Axis I and II Disorders. | Diabetes, coronary artery disease, carpal tunnel syndrome in the left arm. |
| IV | Psychosocial stressors. | Events in a person's life, such as death of a loved one, starting a new job, college, unemployment, and even marriage can impact the disorders listed in Axis I and II. These events are both listed and rated for this axis. | Problems related to primary support group; social environment; occupational and marital dysfunction. |

---

[4]

The functional limitations in paragraph "C" must be the result of the mental disorder described in the diagnostic description that is manifested by the medical findings in paragraph "A".

| V | GAF | On the final axis, the clinician rates the person's level of functioning both at the present time and the highest level within the previous year.  This helps the clinician understand how the above four axes are affecting the person and what type of changes could be expected. | GAF (current) of 48 suggests serious symptoms (ex: suicidal ideation, severe obsessive rituals) OR any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job).<br>GAF (highest past year) of 60 denoting moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers). |
| --- | --- | --- | --- |

(Docket No. 11, pp. 887-893 of 913; www.dsm.psych.org).

During each clinical session that followed, Plaintiff continued to have insomnia but she was free from delusion and hallucinations; her thought process was clear and her symptoms were regulated without side effects.  In the treatment plan, Dr. Hart's goal was to assist Plaintiff with reducing the frequency and intensity of anxiety symptoms, stabilizing her mood, and stabilizing the use of prescribed psychotropic medications (Docket No. 11, pp. 865-878; 885- of 913).

Dr. Marianne Collins, Ph. D., conducted a "clarifying call" on July 14, 2010, at which Plaintiff reported that she benefitted from taking Zoloft and her psychological condition and memory problems were unchanged (Docket No. 11, p. 609 of 913).

Dr. Hart revised the diagnosis and treatment plan on July 29, 2010, adding a generalized anxiety disorder to Axis I (Docket No. 11, pp. 882-884 of 913).

On August 23, 2011, Dr. Hart further revised the treatment plan, including goals for reducing the frequency of racing thoughts, stabilizing Plaintiff's mood by reducing the frequency and intensity of depressive and anger symptoms and stabilizing the use of prescribed psychotropic medication. Dr. Hart adopted her previous findings under the DSM with the exception of Plaintiff's GAF which she suggested was now 65, a score denoting the presence of some mild symptoms or some difficulty

16

in social, occupational, or school functioning, but generally functioning pretty well; has some meaningful interpersonal relationships.  Plaintiff's current GAF of 53 denotes moderate symptoms or moderate difficulty in social, occupational, or school settings  (Docket No. 11, pp. 879-882 of 913).

Ms. Meghan DeGregory, LPN, under the supervision of Dr. Erin L. Klekot, M.D., specializing in psychiatry, conducted a medication management review on August 31, 2010.  Initially, diagnoses of bipolar disorder, not otherwise specified, nicotine dependence and rule out alcohol abuse, were made.  On October 12, 2010; November 19, 2010; December 28, 2010; March 4, 2011; April 1, 2011; May 31, 2011, August 25, 2011 and August 31, 2011, Dr. Klekot modified the drug regimen, adding to the staples of Seroquel and Xanax, Abilify®, Zoloft and Lamictal (Docket No. 11, pp. 865-878 of 913).  During an evaluation on August 31, 2011, Dr. Klekot, too, used the DSM to categorize Plaintiff's mental impairment as follows:

| AXIS | WHAT AXIS 1 MEASURES: | DR. MELKOT'S APPLICATION TO PLAINTIFF: |
|---|---|---|
| I | Clinical disorders. | Bipolar disorder, not otherwise specified; nicotine dependence; alcohol abuse. |
| II | Developmental disorders & personality disorders. | Deferred. |
| III | Physical conditions. | Obesity; hypertension, heart disease, diabetes, carpal tunnel syndrome, left; COPD. |
| IV | Psychosocial stressors. | Significant conflict with husband; occupational issues and financial stress. |
| V | GAF | GAF (goal) of 50 denotes serious symptoms (ex: suicidal ideation, severe obsessive rituals) OR any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job). notes |

(Docket No. 11, pp. 894-897; 898 of 913; www.healthgrades.com/physician/dr-erin-klekot).

**VI.  THE LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS.**

The Commissioner's regulations governing the evaluation of disability for DIB are found at

17

20 C. F. R. § 404.1520.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB is available only for those who have a "disability."  *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires.  *Key v. Callahan*, 109 F. 2d 270, 274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at 730.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

18

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

### VII. THE ALJ'S FINDINGS.

After careful consideration of the entire record, the ALJ made the following findings:

1. Step one–Plaintiff met the insured status requirements of the Act through December 31, 2012.  She had not engaged in substantial gainful activity since September 12, 2006, the alleged onset date.

2. Step two–The ALJ determined that Plaintiff had seventeen severe impairments:

   - Asthma.
   - Anxiety Disorder (generalized).
   - CAD.
   - Carpal Tunnel Syndrome (Left side).
   - COPD.
   - Coronary Artery Bypass Grafts.
   - Coronary Artery Disease.
   - Depressive Disorder.
   - Diabetes mellitus with neuropathy.
   - Early Secondary Membrane of the Eye.
   - Gastroesophageal Reflux Disease.
   - Gout.
   - Hyerlipidemia.
   - Hypertension.
   - Lumbar spondylosis.
   - Obstructive sleep apnea.
   - Poly-substance dependence.

3. Step three--Plaintiff's impairments, either individually or in combination with each other, did not medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Plaintiff had the RFC to perform sedentary work, except that she may:

- Occasionally crouch, balance, climb ramps and stairs but never climb ladders, ropes or scaffolds.
- Perform work tasks that are simple, routine and repetitive that can be learned in 30 days or less and which are low stress which is defined as being preclusive of high production quotas, strict time requirements, arbitration, negotiation, confrontation, directing the work of, or being responsible for the safety of others.

Plaintiff must avoid:

- Concentrated exposure to odors, dust, gases, fumes, poorly ventilated areas and extremes of heat and cold.
- Occupational driving.
- Workplace hazards such as unprotected heights or dangerous moving machinery.

4.      Step four--Plaintiff was unable to perform any past relevant work.

5.      Step five–Considering Plaintiff's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff can perform.

6.      In conclusion, Plaintiff was not under a disability as defined in the Act from September 12, 2006, through the date of the decision (Docket No. 11, pp. 18-32 of 913).

## VIII. STANDARD OF REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*. *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011).  A district court's review is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings.  *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)).

"Substantial evidence" is evidence that a reasonable mind would accept to support a

conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).  The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id.* at 740-741.  To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).  Further, a district court must not focus, or base its decision, on a single piece of evidence.  Instead, a court must consider the totality of the evidence on record.  *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)).  If there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact.  *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. *Id.*  It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)).  Consequently, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)).  The ALJ's decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

## IX. ANALYSIS.

In her Brief and Reply, Plaintiff, *pro se,* seeks a finding that she is disabled given the multitude of impairments or remand for further review. Additionally, she provides further explanations to clarity her functional limitations.

Under 42 U.S.C. § 405(g), this Court has jurisdiction to hear claims based on the denial of Social Security benefits. Additionally, the section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. In other words, the Commissioner's findings of fact are conclusive unless she fails to apply the correct legal standard or make findings unsupported by substantial evidence in the record. The Magistrate may not try the case *de novo*, elicit testimony, substitute its own findings of fact and conclusions, resolve conflicts in the evidence or decide questions of credibility. Accordingly the Magistrate cannot consider Plaintiff's comments, explanations or assertions of new facts.

The Magistrate will consider whether to grant Plaintiff's request for reversal and remand for an immediate award of benefits based on the following purported errors:

1. Counsel failed to bring to the attention of the ALJ her bipolar disorder or rehabilitation.
2. The ALJ misconstrued the evidence of the range of activities.
3. The ALJ failed to consider that her combined impairments constitute a disability.
4. Defendant failed to present accurate facts in her brief.

Defendant responds that:

1. The ALJ's two-step findings were appropriate.
2. Substantial evidence supports the ALJ's credibility assessment.
3. Substantial evidence supports the Commissioner's decision

22

1.    PLAINTIFF'S BIPOLAR DISORDER AND IMPROPER REHABILITATION.

Plaintiff suggests, without making a specific request, that she should be entitled to application of the more liberal standards afforded uncounseled claimants since, in her view, her counsel was ineffective.  To support this position, Plaintiff argues that counsel had a heightened duty to submit certain records documenting that she was diagnosed with bipolar disorder.  Moreover, when testifying, Plaintiff claims that she was nervous, confused and panicked.  She felt that the ALJ found her disingenuous and counsel did nothing to rehabilitate her credibility.

While the law entitles a claimant to representation by an attorney or other representative at a hearing related to a social security disability case, *see Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986), the Supreme Court has not recognized a constitutional or statutory right to effective assistance of counsel in a civil case.  *Strickland v. Washington,* 104 S.Ct. 2052, 2063-2064 (1984).

Upon review of the record, the undersigned finds that Plaintiff's counsel appeared to be knowledgeable about Social Security law and the hearing process and therefore, gave Plaintiff appropriate legal assistance.  Counsel elicited testimony about Plaintiff's education, work experience, impairments and difficulty performing daily activities.  There was no basis for objection to the hypothetical questions and answers on the part of the VE as they take into account Plaintiff's age, education, work experience, transferable skills and subjective symptomology as determined by the ALJ.  Counsel made a proper record and a claim that he was ineffective is not persuasive.

While credibility determinations regarding subjective complaints rest with the ALJ, the determinations must be reasonable and supported by substantial evidence.  The ALJ could not have

been more specific on the reasons used to discredit Plaintiff's testimony.  The ALJ did not place undue reliance on how Plaintiff delivered her testimony, rather, the ALJ focused on whether Plaintiff's subjective complaints were consistent with the medical evidence.  The ALJ stated emphatically that "although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistences suggest that the information provided by the claimant generally may not be entirely reliable" (Docket No. 11, p. 29 of 913).  The Magistrate cannot overlook the fact that the record as a whole provides sufficient foundation for the ALJ's credibility determination.

The adverse impact of counsel's failure to highlight Plaintiff's bipolar disorder is not abundantly clear.  Counsel understood that ALJ was not bound by Dr. Klekot's diagnosis since it was an impression or working diagnoses generated at the initial evaluation for treatment and it was based exclusively on Plaintiff's subjective claims rather than objective medical evidence.  Thereafter, Dr. Klekot saw Plaintiff on the average of nine minutes each during each session.  The routine included a description of Plaintiff's present symptoms to the LPN and then Dr. Klekot made medication changes based solely on the assessment of Plaintiff's symptoms (Docket No. 11, pp. 865-878 of 913).  There are no treatment notes, narratives or comprehensive overviews of symptoms by Dr. Klekot.  Furthermore, Dr. Klekot's examination does not even speculate as to the effect, if any, that the disease has on Plaintiff's functional or physical limitations, daily activities or ability to secure and maintain employment.

There is no reason to believe that the ALJ did not consider Dr. Klekot's medical records.  The ALJ referenced the exhibit in which Dr. Klekot's records were incorporated but failed to rely on them to the extent that they lacked substantiation.  The ALJ was entitled to find that in the absence of objective medical evidence, there was sufficient evidence that the bipolar disorder was not a severe

24

impairment. .

**2.     DAILY ACTIVITIES**

Plaintiff does not challenge the accuracy of the evidence on which the ALJ relied to determine her typical daily activities.  Rather, she suggests that the ALJ erroneously considered that she performed all of these activities daily.

The Magistrate agrees with the ALJ's conclusion that Plaintiff's allegation of disability is inconsistent with her activities of daily living.  The activities of daily living are generally relevant to the RFC finding.  When making such assessment, the ALJ must include a narrative describing how the evidence supports each conclusion, citing specific medical facts such as laboratory finding and nonmedical evidence such as daily activities. TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96-8p, 1996 WL 374184 (July 2, 1996).  Here,  the ALJ took into account all of the information of record from treating sources about the activities of daily living over a significantly long period of time prior to the date of adjudication to establish a baseline level of function.  The ALJ considered that in the FUNCTION REPORT-ADULT, a self-report dated November 23, 2009, Plaintiff reported that:

1.    She cared for two dogs, two birds and a cat.
2.    She prepared the meals daily and otherwise cared for her family by completing household chores as needed.
3.    Plaintiff was able to leave the house alone and she tried to get out every day, taking either a walk or driving or riding in a car.
4.    She shopped once weekly.
5.    Her hobbies included reading, sewing, cards and board games, watching television and using the internet.  On October 25, 2010, Plaintiff reported to Dr. Irvin that she just got back from camping (Docket No. 11, p. 858 of 913).
6.    She read every day, played cards once weekly, sewed when she could and watched television and used the internet daily.
7.    She had no difficulty with her personal needs and grooming (Docket No. 11, pp. 184-191 of 913).

25

Consistent with her self report, in December 2009, Dr. VanEstenberg found that Plaintiff had only mild functional limitations in daily living activities, no functional limitations in maintaining concentration, and that she had only moderate difficulties in maintaining social functioning.

The transcribed record from November 15, 2011 hearing includes Plaintiff's sworn testimony that she was able to engage in a wide variety of activities including using the computer for 45-minute increments daily, cooking, occasionally visiting friends, playing darts twice weekly; exercising daily; and driving at least twice weekly:

Q:      . . . . . how often do you try to walk a week?
A.      Usually every day.
Q.      Okay.  And how long can–and I know it varies, but typically, how long can you go with that, that exercise?
A.      Probably roughly about 20 minutes. . . .
Q:      Now, you said you do have a computer at home.  Are you able to use it?
A.      Yes.
Q:      Okay.  What do you use it for?
A.      Mainly, I just, I go onto Facebook–
Q.      How long is each session, typically?
A.      Half-hour, 45 minutes. . . .
Q.      Okay, Okay, so in a typical day, you said you try to exercise a little bit, use a computer a couple of times a day, a half-hour at a time.  What else do you do?
A.      I try to clean the house.  I try to get that done . . . The only thing I do outside of the house is play darts. . . .
         I go to dart practice on Tuesdays.  I go to our dart league on Wednesday nights, and then if I go to the grocery store or go visit a friend (Docket No. 11, pp. 48-49; 52-53 of 913).

The ALJ's finding as to her daily activities is consistent with both Plaintiff's self-report and her testimony at the administrative hearing.  Taking into account Plaintiff's activities of daily living, and distinguishing between those that occurred in November 2009 and those from November 2011, there is no probative evidence that suggests Plaintiff's impairments foreclose the daily activities that she reported performing in November 2009.  The Magistrate is persuaded that the ALJ properly determined that these activities were within a range of activities performed daily not that she

performed all such activities daily.

**3.** **THE COMBINED IMPAIRMENTS.**

Plaintiff finds it difficult to understand that even if the number of impairments she has may not be disabling individually, the combined effect of her multiple impairments certainly demonstrates a presumptive disability.

While there is no prescribed mode of analysis, the Sixth Circuit has found that an ALJ's analysis of a claimant's combined impairments sufficient where the ALJ referred to a "combination of impairments" in deciding the claimant did not meet the listings. *Ridge v. Barnhart*, 232 F.Supp.2d 775, 789 (N.D.Ohio,2002) (*See Gooch v. Secretary of Health and Human Services*, 833 F.2d 589, 592 (6[th]Cir.1987)). The combined effect of all of the individual's impairments must be considered in determining whether a claimant is severely impaired so as to be considered disabled, without regard to whether any of these impairments, if considered separately, would be of such severity. 42 U. S. C. § 423(d)(2)(B) (Thomson Reuters 2014). If the Commissioner does find that a medically severe combination of impairments exists, the combined impact of the impairments must be considered throughout the disability determination process. *Id*. The claimant's impairments must be considered in combination, and must not be fragmented in evaluating their effects on the individual claimant. *Bishop v. Commissioner of Social Security*, 2014 WL 902587, *7 (W.D.Mich.,2014) (*see Colwell v. Gardner*, 386 F.2d 56, 74 (6[th]Cir.1967)).

Although every element of the record was not discussed individually, that hardly suggests that the totality of the record was not considered, particularly in view of the fact that the ALJ specifically referred to the "combination of impairments" in deciding that Plaintiff's impairments were not of the severity to meet the Listing. It is also clear that the ALJ referred to the claimant's "impairments" as not being severe enough to preclude performance of her past relevant work after careful consideration

27

of the entire record, and, all of Plaintiff's impairments were discussed individually in the decision. The ALJ even considered the cumulative effect of Plaintiff's obesity and mental illness with her other impairments and the fact that in combination, such impairments may be greater in severity than might be expected without obesity and mental impairments.  Moreover, the ALJ analyzed all of Plaintiff's impairments and explained how the combination of these impairments failed to demonstrate medical equivalence under Listing 3.02, 3.03, 4.11, 9.0, 11.14, 12.04, 12.06 and 14.09 (Docket No. 11, p. 21 of 913).

The ALJ used  appropriate language to demonstrate that the mere accumulation of impairments will not establish medical equivalence.  She considered Plaintiff's combined impairments and discussed Plaintiff's overall combined cumulative effect of these limitations, including obesity and mental illness, and whether together, they rendered Plaintiff disabled.  Based on prevailing statutory and regulative requirements, the ALJ followed the rules and there is sufficient evidence in the record to support her conclusion that Plaintiff does not have an impairment or combination of impairments that meet or medically equals the severity of a listed impairment.

**4.**     **DEFENDANT'S BRIEF ON THE MERITS**.

Plaintiff comments on the Defendant's Brief on the Merits, pointing out that several facts are inaccurate.  The Magistrate notes that Defendant's recitation of Plaintiff's activities of daily living to include the following statements misstates the record:

- Plaintiff stated that she is currently taking classes at the local community college twice a week (Docket No. 11, pp. 55; 59 of 913).
- Plaintiff testified that she continues to drive to and from school (Docket No. 11, p. 61 of 913)
- Plaintiff also noted that she relies on her mother to help her with household chores and her daughter (Docket No. 11, p. 62 of 913).

Defendant's inclusion in its brief of such  inaccurate statements  is not determinative of

28

whether the ALJ's decision is supported by substantial evidence.  This Court's review is very narrowly focused on determining whether the evidence supports the Commissioner's decision.  The incorrect summary of such facts by defendant does not preclude meaningful judicial review.  Neither is the incorrect recitation of these facts prejudicial to Plaintiff's rights as the Court, in making its decision,  relies upon the official record rather than the brief of either party.

CONCLUSION.

For the foregoing reasons, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  March 31, 2014

## XIII. NOTICE

Please take notice that as of this date the Magistrate's Report and Recommendation attached hereto has been filed.

Please be advised that, pursuant to Rule 72.3(b) of the Local Rules for this district, the parties have ten (10) days after being served in which to file objections to said Report and Recommendation. A party desiring to respond to an objection must do so within ten (10) days after the objection has been served.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.